UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

EMPIRE ENTERPRISES JKB, INC.

                              Plaintiff,

v.                                           TRIAL MEMORANDUM
                                                 Case No. 6:05-CV-6461L

UNION CITY CONTRACTORS, INC.,
NOVA CASUALTY COMPANY, and
NOVA AMERICAN GROUP, INC.,

                              Defendants.
_____

      The issue in this case is the amount of floatable debris chipped and removed from the Mt. Morris Dam site by the plaintiff, Empire Enterprises JKB, Inc. (Empire). Empire claims it chipped and removed 11,450 c/y of floatable debris per invoice dated September 17, 2000 (Exhibit 10). The defendant, Union City Contractors, Inc. (Union City), alleges that a significantly lesser amount of floatable debris was chipped and removed from the dam site.

      There is no dispute that the contract between the parties (Plaintiff's Exhibit 4) and the contract with the Army Corps of Engineers (Corps) required that the floatable debris be both ground and removed to an appropriate waste site. The burden of showing performance, grinding and thereafter removing the floatable debris rests on Empire, Scaduto v. Orlando, 381 F2d 587. Other than Rick Collins' signature on the first grinding slip (Plaintiff's Exhibit 6A) and testimony by both Collins and Bartucca that three cones of wood chips were produced on the first day, there is no verification of the amount of chips made or hauled from the site. All other records are based on Empire's unverified count and the sole testimony of Joseph Bartucca.

## EMPIRE'S CHIP COUNT IS EXAGGERATED

The accuracy of Mr. Bartucca's testimony is suspect for a number of reasons. First, Empire failed to call any employee other than Joseph Bartucca. Plaintiff's Exhibit 7 indicates the names and hours worked for each Empire employee. These employees were truck drivers and equipment operators. They could certainly verify the extent of their labors, the amount of debris hauled, and the method of producing and removing the cones. The failure to call a witness that can elucidate the transaction creates a presumption that the witnesses' testimony would not be favorable. See, People v. Savinon, 100 NY2d 192; Graves v. United States, 150 US 118, 121. Surely, at minimum, the truck drivers could have verified the frequency of their trips and the operators could have verified that they removed the cone to level ground before the start of a new cone.

Empire, on the first day of chipping, called upon Rick Collins to verify the count. Mr. Collins described his duties at the job site and was present on site if called. Empire's work sheet, Exhibit 7, and the 8/10/04 ticket both indicate Rick Collins' cell phone number. Yet, Mr. Bartucca, after the first day, never called him to verify the cone count. Rick Collins stated he never kept track of the count (Page 1-137, Line 11). He also stated that his daughter, Jennifer, was basically a safety flagger (Page 1-128, Line 15) and acted as a clerk (Page 1-128, Line 15). All witnesses testified that Jennifer could not see the floor of the dam site from the trailer office. Rick Collins' daughter, Heather, who was stationed at the bottom of the roadway, was also a safety flagger (Page 1-128, Line 15) and no part of her job was to measure cones (Page 1-129, Line 21). One may infer that in failing to call Rick Collins to verify the cone count on a daily basis, Mr. Bartucca did not wish his numbers to be properly verified.

Mr. Bartucca attempts to bolster his testimony concerning the cone count by relating daily conversations with Heather Collins while driving up to the construction trailer and with Heather and Jennifer Collins in the trailer, indicating that: "…and then the three of us went into the construction trailer, myself, Heather and Jennifer was in the trailer, and the ticket was --- we compared our notes and it was agreed upon and the ticket was produced" (Page 1-48, Line 25 to Page 1-49, Line 3). However, Jennifer stated "…Joe would come in, and he would give me the count for the day. He would have a little ticket that he would show me. I would write that down on the CQC form (Exhibit O Page 14, Line 5). Jennifer described the occurrences, "Maybe one day he would calculate it in his head while he stood in front of me, and write it down. Another day, he would have it ready when he came up, as I remember", (Exhibit O, Page 16, Line 23). Heather Collins testified that she was responsible for safety (Page 2-307, Line 12) and never counted the cones (Page 2-310, Line 17). She stated that, on occasion, she rode up after work with Joe Bartucca (Page 2-315, Line 25) but did not speak to him about cone counts (Page 2-316, Line 1). She also stated she only occasionally entered into the trailer (Page 2-316, Line 7) and never took part in cone counts (Page 2-316, Line 18). If Mr. Bartucca is embellishing his testimony concerning the participation of the Collins sisters in daily verifying the cone count (Page 1-49, Line 4) then his testimony, as to the cone count itself, is suspect on the ground of "falsus in uno, falsus in omnibus".

The accuracy of Empire's cone count is further suspect and in conflict with the historical cubic yardage of floatable debris removed from the site during a normal year. Mr. Gerald DiPaolo, a civil engineer for the Corps of Engineers acting as the contracting officer's representative (Page 2-241, Line 17), stated that the total quantity of floatable

debris set out on the bid schedule (Exhibit 19) was based on "historical data" (Page 2-244, Line 9). He further stated that for the two prior years the "approximate quantity removed was about 2,000 cubic yards each year" (Page 2-244, Line 14) measured by truck capacity count (Page 249, Line 2). Mr. DiPaolo prepared a spread sheet (Exhibit G) calculating a total of 6,820 c/y of removed floatable debris and Union City was eventually paid on this basis for removal of floatable debris (Page 2-261, Line 9). This quantity is set out also on the CQC report (Exhibit 13) and (on Exhibit J), a final invoice dated July 11, 2006 (Page 2-262, Line 18).

Both Rick Collins and Duane Cuyler testified that the debris field after the hurricane far exceeded the debris field chipped by Empire. Rick Collins stated that the debris field was far greater (Page 1-138, Lines 25 and Page 1-139, Line 17 to Page 1-40, Line 3). Duane Cuyler described the hurricane debris field as slightly more than the first phase (Page 3-336, Line 16). A comparison of first phase photo 17B with post hurricane photo 14A shows significantly more debris lodged against the dam after the hurricane. Mr. Cuyler testified that Union City chipped the hurricane debris. The amount chipped was approximately 2,500 c/y (Page 3-385, Line 18). This comparison again indicates that Empire's chip count is grossly exaggerated.

EMPIRE'S OWN RECORDS DO NOT SUPPORT ITS CHIP COUNT

It may logically be assumed that if the floatable debris was removed it was in the main chipped. One, however, cannot assume that all debris chipped was, in fact, removed or that each cone was properly started on ground level with the chipper so as to produce a cone of 350 cubic yards. Empire claims payment for 11,470 c/y of chips removed. Empire's own records do not support this amount.

**Empire's tickets, on their face, indicate the following:**

| Date | C/Y Chipped | C/Y Removed |
|---|---|---|
| 8/10/04 | 1050 | |
| 8/11/04 | 700 | |
| 8/12/04 | 1050 | |
| 8/13/04 | 1400 | |
| 8/16/04 | 1400 | |
| 8/17/04 | 1050 | |
| 8/18/04 | 2100 | |
| 8/19/04 | | 350 |
| 8/20/04 | | 1008 |
| 8/25/04 | | 1369 |
| **TOTAL** | **8750** | **2720** |

**Empire's daily log sheet shows a different count:**

| Date | C/Y Chipped | C/Y Removed | C/Y Undesiginated |
|---|---|---|---|
| 8/10/04 | 1050 | | |
| 8/11/04 | 700 | | |
| 8/12/04 | 1050 | | |
| 8/13/04 | | | 1400 |
| 8/16/04 | 1400 | | |
| 8/17/04 | -0- | -0- | -0- |
| 8/18/04 | -0- | -0- | -0- |
| 8/19/04 | 700 | 350 | |
| 8/20/04 | 1400 | 1008 | |
| 8/25/04 | | 2016 | |
| **TOTAL** | **6300** | **3374** | **1400** |

**The CQC report which, according to Mr. Bartucca was jointly generated, indicates as follows:**

| Date | C/Y Chipped | C/Y Removed | Spread Sheet | |
|---|---|---|---|---|
| 8/10/04 | 1050 | | | |
| 8/11/04 | 700 | | | |
| 8/12/04 | 1050 | 1050 | | Note 1 |
| 8/13/04 | 1400 | 1400 | | Note 1 |
| 8/16/04 | 1400 | | | |
| 8/17/04 | 1050 | | | |
| 8/18/04 | 2100 | | | |
| 8/19/04 | | 350 | | Note 2 |
| 8/20/04 | | 1008 | | Note 3 |
| 8/23/04 | | | 5458 | Note 3 |
| 8/24/04 | | 1362 | 1362 | |
| 8/26/04 | | | | |
| **TOTAL** | **7350** | **5170** | **6820** | |

| | |
|---|---|
| Note 1 | Record indicates debris chipped and removed. |
| Note 2 | Record indicates 5 dump loads removed. |
| Note 3 | Record indicates to date, wood chips removed – 5458 cubic yards. |

At first glance, it seems that the 5458 c/y notation on the 8/20/04 and 8/23/04 CQC entries appears without reference. However, if we add the first two days of work to include both chipping and removal, the total to 8/20/04 is 5558 c/y removed or, 100 cubic yards more than the 5458 entry.

Part of the confusion is created by Empire's allegation that removal and chipping quantities occurred equally on the same day. This is highly unlikely. Bartucca claims he created three cones on the first day. He further claims that Rick Collins verified the count and signed the slip indicating 1050 c/y were chipped. Presumably Collins verified the count at the end of the work day, when he observed three standing cones. Therefore 1050 c/y would not have been removed on the first day and removal did not occur until days later, likely October 12, 2007, as indicated in the CQC report.

## CONCLUSION

Plaintiff has not borne it's burden of proving the cubic yardage of floatable debris chipped and removed. The highest showing of removals appears on the CQC report integrated into the Corps' prepared spread sheet at 6820 c/y. This is the amount that Union was paid for after much negotiation with the Corps. Union City rightly rejected Empire's demand for payment based on 11,470 c/y of removals. The CQC entry of removals equaled 5170 c/y. Union's offer of settlement based on a 5392 c/y truck count was consistent with the CQC report of daily recorded removals. Union City should not be penalized by Empire's overreaching.

Dated: February 26, 2008

Martin S. Handelman by ____
Martin S. Handelman
HANDELMAN, WITKOWICZ & LEVITSKY
Attorneys for Union City Contractors, Inc.
16 East Main Street, Suite 410
Rochester, New York 14614

CC:    Anthony J. Adams, Jr., Esq.
        GATES & ADAMS, P.C.
        Attorneys for Plaintiff
        28 E. Main Street, Suite 600
        Rochester, New York 14614

        Gregg O'Mahoney, Esq.
        Claims Attorney
        NOVA Casualty
        180 Oak Street
        Buffalo, New York 14203