UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

EMPIRE ENTERPRISES JKB, INC.

                              Plaintiff,

    -vs-
                                              **PLAINTIFF'S POST-TRIAL MEMORANDUM OF LAW**

UNION CITY CONTRACTORS, INC.,         Case No. 6:05-CV-6461L
NOVA CASUALTY COMPANY and
NOVA AMERICAN GROUP, INC.,

                              Defendants.

      Plaintiff, Empire Enterprises, brought this action against Union City Contractors and its sureties, Nova Casualty Company and Nova American Group, Inc. (collectively "Nova")[1], to recover $83,953.63 plus interest for chipping and removing wood debris from the Mt. Morris Dam site pursuant to a written subcontract agreement. Federal jurisdiction over the claim against Nova is afforded by the Miller Act, 40 USC §3133. The Court has supplemental jurisdiction over Plaintiff's contract claim against Union City. 28 USC §1367; U.S. ex rel. Apex Roofing & Insulation v. Union Indemnity Ins., Co., 865 F2d 1226, 1228 (11th Cir. 1989).

      Although Defendants have refused to pay Plaintiff's claim since September 17, 2004 the proof at trial revealed that the claim is virtually undisputed. The terms of the subcontract (Exhibit 4) are uncontested, requiring that Plaintiff be paid $10.00 per cubic yard of wood debris processed, and providing that the quantity of cubic yardage be determined by the "cone" method as documented in daily work tickets (Exhibits 6A-6J) that were signed by Union City.

      That the cone method was approved by the Army Corps of Engineers ("ACOE") was established by Defendants' own witness. Transcript, pp. 251-252, 349-350. The accuracy of

---

[1] Both sureties admitted their liability under the payment bond by failing to deny the relevant allegations of the Complaint. See Amended Answer, docket entry #31, and FRCP 8(d).

Plaintiff's work tickets, generated between August 10 and 20, 2004, was certified by Union City in its daily "CQC Reports" to the Government, (Exhibit B). Those work tickets and CQC Reports undisputedly documented Plaintiff's production of 11,470 cubic yards of wood chips, and the unimpeached testimony of Plaintiff's president established that all those wood chips were removed (Transcript, pp. 42, 51-60), and disposed of per the subcontract at a site that union City specified (Transcript, pp. 29-32).

It was also uncontroverted that Plaintiff duly invoiced Union City for the 11,470 yards chipped at the contract rate, totaling $114,700.00, on September 17, 2004 (Exhibit 10). Defendants concede that they paid Plaintiff for only 3,000 cubic yards, in the amount of $30,046.37,[2] even though the Government paid Union City for 4,000 cubic yards on August 27, 2004 and for another 2,820 yards on July 11, 2006 (Transcript pp. 276-277).

On the question of liability there is simply no issue. Plaintiff is entitled to judgment against Union City under the contract, and against Nova Casualty under the Miller Act, for the full amount of its unpaid invoices equal to $84,653.63.[3]

Plaintiff is also entitled to pre-judgment interest at 9% from the date its contract payment was due. On the State law contract claim against Union City that entitlement is established by NY CPLR 5001, which provides that in the case of a breach of contract "interest shall be awarded… from the earliest ascertainable date the cause of action existed." CPLR 5004 specifies that the applicable rate is nine percent.

For the Miller Act claim against Nova the analysis is somewhat different but the result is the same. "[A]ny award of prejudgment interest against the sureties is a matter of federal

---

[2] Plaintiff's total invoice, including an agreed amount for rental of a piece of "low boy" equipment, was $115,403.63, against which Defendants paid only $30,750.00. See Exhibit 11.
[3] At the close of proof Defendants withdrew their claims that Plaintiff was limited to what Union City had been paid by the Government. The defense had no merit in any event either under State law (West-Fair Electric Contractors v. Aetna Casualty & Surety Company, 87 NY2d 148 (1995)) or under the Miller Act (U.S. ex rel. Walton Technology, Inc. v. Weststar Engineering, Inc., 290 F3d 1199 (9th Cir., 2002)).

law." U.S. ex rel. Maris Equipment Co. v. Morganti, Inc., 175 F.Supp2d 458, 460, aff'd ___ F3d ___, 67 Fed. Appx. 68 (2d Cir., 2003). However, "[s]ince the Miller Act is silent on the issue of prejudgment interest, federal courts have consistently looked to state law as an appropriate source of guidance." Id.. Once again CPLR 5001 and 5004 apply and entitle Plaintiff to prejudgment interest at 9% against Nova, too. Id., accord; U.S. ex rel. Lochridge-Priest, Inc. v. Con-Real Support Group, Inc., 950 F2d 284, 288 (5th Cir., 1982); U.S. ex rel. Straightline Corporation v. American Casualty Co., ___ F.Supp2d ___, 2007 WL 2050323 (N.D.W.V. 2007).

The proof also established that Defendants have never had a good reason for their refusal to pay Plaintiff pursuant to the terms of the parties' subcontract, and that the excuses they advanced before and after this suit was commenced, right up through trial, were frivolous and were advanced in bad faith for purposes of avoiding paying Plaintiff even the balance he was admittedly owed, and for which Union City was itself paid by the Government. In such a case, this Court has discretion to award Plaintiff its attorney fees, under the exception to the "American Rule" that the Supreme Court recognized for Miller Act cases in F.D. Rich Co. v. U.S. ex rel. Industrial Lumber Company, 417 US 116, 129 (1974). While holding that attorneys fees awards under the Miller Act are a matter of federal, rather than state law, the Court observed that:

> The Federal Judiciary has recognized several exceptions to the general principle that each party should bear the costs of its own legal representation. We have long recognized that attorneys' fees may be awarded to a successful party when his opponent has acted in bad faith, vexactiously, wantonly, or for oppressive reasons, … [footnote omitted]. Id.

Since F.D. Rich, supra, the Second Circuit has had occasion to expand upon the circumstances in which a discretionary award of attorneys' fees under the "bad faith" exception

is appropriate. In Nemeroff v. Abelson, 704 F2d 652 (1983), that Court observed that while the rule permitting an award of attorneys' fees in cases of bad faith "must be applied with caution," it also "must be applied in appropriate cases to spare members of the public from the expense of defending against baseless allegations." Id., at 654. In upholding an award of attorneys' fees in that case, the Nemeroff Court focused on the requirement that allegations made in litigation must be at least "colorable," else they will be found to evidence the kind of abusive intentions that support an award of attorneys' fees. A claim is "colorable," the Court said, "as long as a reasonable attorney could have concluded that facts supporting the claim might be established." Id., at 658. However, a claim or a defense is not colorable if a party or his attorneys have "only the most attenuated grounds for believing" that they would be able to establish them in court. Id. In Nemeroff, the court found that plaintiff and his attorneys might have had grounds for believing their allegations could be supported when they first commenced the action, but that once it became clear that the allegations could not be supported the continued pursuit of those allegations evidenced bad faith for which an award of attorneys' fees to the other party was appropriate.

The Nemeroff Court also observed "that the pace of discovery can be an appropriate factor to consider in determining the state of mind" of a party and its attorneys. Id., at 661. The more tenuous the claim the more vigorous should be the disclosure efforts. Id. The Court observed:

> In this case, the pace of discovery was just one factor that contributed to the District Court's finding of bad faith. Far more important was the fact that [plaintiff] and his attorneys chose to keep [defendants] in court without an adequate factual basis behind the case. Id.

Two years later, in Eastway Construction Corp. v. City of New York, 762 F2d 243 (2nd Cir., 1985) the same court found that the District Court abused its discretion in refusing to award attorneys fees against a party whose conduct had been frivolous. Relying particularly upon Federal Rule 11 the Court focused on the requirement that allegations in a signed pleading be "formed after a reasonably inquiry." Id., at 253:

> No longer is it enough for an attorney to claim that he acted in good faith, or that he personally was unaware of the groundless nature of an argument or claim. For the language of the new Rule 11 explicitly and unambiguously imposes an affirmative duty on each attorney to conduct a reasonable inquiry into the viability of a pleading before it is signed. Simply put, subjective good faith no longer provides the safe harbor it once did.

Furthermore, as the Second Circuit emphasized, a violation of Rule 11 may authorized sanctions against the client "when it appears that a pleading has been interposed for any improper purpose or where, after reasonably inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of the existing law." Id., at 254.

In U.S. ex rel. Treat Brothers Company v. Fidelity & Deposit Company of Maryland, 986 F2d 1110 (7th Cir., 1993), the Seventh Circuit determined, *en banc*, that an award of attorneys' fees against a defendant in a Miller Act case was appropriate where defendants "had litigated the claim in bad faith." Id., at 1112. There, as here, a contractor refused without justification to pay the claims of its subcontractor, choosing instead to trump up various back charges that were calculated to offset the subcontractor's legitimate claims. The Court of Appeals explicitly recognized that attorneys' fees are not ordinarily recoverable in a Miller Act case, and that while courts have discretion to award attorneys' fees against an opponent who

has acted in bad faith, "vexatiously, wantonly or for oppressive reasons," that discretion is to be exercised "with great circumspection." Id., at 1120. Nevertheless, the *en banc* panel of the Seventh Circuit determined that attorneys' fees were properly awarded against the defendant:

> In this case the District Court determined that [defendant] had attempted, through this litigation, to pass off on [plaintiff] the financial onus of [defendant's] own mistakes through the imposition of groundless back charges and unrealistic estimates for incomplete work. The District Court specifically found these efforts to constitute bad faith. We believe these determinations are sufficiently specific to require that we leave undisturbed the determination of our colleague in the District Court that the circumstances before it warranted the imposition of attorneys' fees. Id.

As recited below, the conduct of the defendants in this case, exacerbated by that of its attorney was far more wanton and abusive than the conduct that gave rise to the award of attorneys' fees in Treat Brothers, supra.

As revealed at trial, Defendants never had a bona fide dispute about Plaintiff's compliance with its subcontract. Exhibit 4 was conceded by all to be the governing contract, and there was no ambiguity claimed concerning its terms. In bold letters in the middle of the page it stated:

> **Note: all yardage to be measured using the volume of a cone -- one cone of ground material equals 350 yards per factory spec -- yardage ground to be logged daily, with payment to be calculated from daily log tickets.**

Nor was there any dispute that Plaintiff proceeded with its contract, including the measurement of its work, precisely in the manner agreed upon. Plaintiff prepared daily log tickets every day based upon the cone method (as approved by the ACOE), and either Rick Collins or his daughter Jennifer, under his authority, signed them (Transcript, pp. 156-157). As Rick Collins

admitted, there was no reason for anyone to keep truck counts and, as far as he knew, nobody was doing so (Transcript, p. 152).

In fact, there was never a bona fide dispute about the correctness of Plaintiff's quantities, either. In the first place, Union City's principal, Duane Cuyler, and its project manager, Rick Collins, admitted they had no prior experience with a project like this and no personal basis for estimating the quantity of wood that was present at bid time. Transcript pp. 125, 161, 329, 335. Cuyler, who prepared his company's bid to the Government, relied entirely on pricing from an unspecified acquaintance for the pricing he assigned to "floatable debris," Transcript, pp. 341-342. He had no idea what quantities to expect or what costs to anticipate. Thus, he completely "blew his bid" by offering to remove all floatable debris above 2,000 yards for a mere five dollars per cubic yard. See Exhibit 18, p. 52. (His claim that he had anticipated only 2,000 cubic yards was either untruthful or unwarranted, as shown by not only the ACOE's bid estimate of 4,000 cubic yards (Exhibit 19), and ACOE's pre-bid advice to the New York State Department of Environmental Conservation that the annual average had been 5,000 cubic yards, (Exhibit 27[4]), but also by Mr. Cuyler's letter to the Government on August 12, 2004, in which he claimed to have estimated 2,000-3,000 yards (Exhibit 13).

In contrast, Plaintiff's president -- who had prior experience with a similar project (Transcript, p. 8-9) -- explained that his own pre-bid inspection (in the company of Union City's representative) revealed that a log-boom breach had caused a greater-than-usual quantity of "floatable debris" to accumulate at the site. Transcript, p. 17. Rick Collins testimony corroborated that observation. Transcript, p. 169.

---

[4] The Court's question whether the annual average recited in this letter, admitted as a business record, was properly before it is answered in the affirmative by FRE Rule 803(6). See Transcript, pp. 283-284.

Less than a week into Plaintiff's work it became obvious to everyone, including Union City, that the quantity of "floatable debris" requiring removal would exceed 8,000 cubic yards. Union City's August 12, 2004 letter to ACOE (Exhibit 13) explained "that due to the breach of the log boom… a tremendous volume of floatables was released and now holding at the front corner of the dam face." Mr. Cuyler himself told the Government, on August 12, 2004 that: "Our best guess at this point is that it could be anywhere from 8,000 to 9,000 yards, produced this year." The ACOE, in response, expressed no surprise at this prediction. To the contrary, its representative responded that Union City should have anticipated the condition, at the same time agreeing to increase the billable quantities of "floatable debris" to 9,300 cubic yards. Exhibit 23-A.

Nor was there anything suspicious about the cone method itself, which ACOE admittedly approved for Plaintiff's use. Transcript p.150-151. Every day Union City accepted Plaintiff's cone counts for inclusion in its CQC Reports to the Government (Transcript, pp. 156-157), above a signed certification "that this report is complete and correct" (Transcript, p. 154).

Later, when ACOE decided that the "cone" method of measuring "floatables" should be abandoned in favor of the more customary "truck" method, it was due to mistrust of Union City's other measurements, relating to silt, rather than (as Union City falsely claimed) to any lack of confidence in Plaintiff's daily measurements. Transcript, pp. 257-258.

To be sure, on August 20 and 21, someone from Union City falsified the company's CQC Reports to the Government (Exhibit B) to report that Plaintiff had processed only 5,458 yards of debris, even though the signed work tickets to that date confirmed that 10,108 cubic yards had been processed (Exhibits 6A-6I). But word of this alteration was never shared with

the Plaintiff (Transcript, pp. 467-468), and Mr. Collins, who signed the reports for Union City, could offer no explanation for the entry of the reduced amount at trial (Transcript, pp. 227-230). In fact, on August 25, 2004, when Collins asked Plaintiff to falsify its work tickets to understate the amount of wood processed, his target amount was 9,300 cubic yards (the amount the ACOE had authorized for billing) rather than the lesser amount that had been inserted into the CQC Reports. Transcript, pp. 468-469. In any event, this falsified number proved to be part of the basis on which the Government paid Union City for "floatable debris." Transcript, p. 281-282.

Meanwhile, on August 27, 2004, the Government made a partial payment to Union City for 4,000 yards of floatable debris. Transcript, p. 265. Union City, however, only paid Plaintiff for 3,000 cubic yards, in two payments made on September 30, 2004 and October 13, 2004 (Exhibit 11).

When Plaintiff pressed for payment of its balance Union City's president promised that payment was forthcoming. Transcript, p. 70. Indeed, Mr. Cuyler admitted that he made such promises. Exhibit 18, pp. 81-82. But then, after Thanksgiving, 2004, Defendants began to dissemble. Out of the blue Union City had its counsel send a letter on November 30 (Exhibit 15) falsely claiming that "Union City logged each truck leaving the site by size of truck and dates" and that: "The yardage by truck measurement and cone measurement vary." As the proof at trial revealed, however, there never were any such daily truck counts. Transcript, p. 152. Later, on December 8, 2004, Union City's counsel sent a second letter (Exhibit 16), this one offering to pay Plaintiff an additional $23,170.00 (less than a third of what was due) but only if Plaintiff signed a general release in exchange.[5] Then, on January 6, 2005, Union City

---

[5] Had Plaintiff accepted this offer it would have been paid for a total of 5,392 yards, even though Union City received payment for 6,280 yards.

falsely certified to the Government that it had paid Plaintiff $40,000.00 against an earned subcontract balance of $54,000.00. Exhibit 30 and Transcript, pp. 300-301.

Meanwhile, on October 5, 2004, Union City had received a contract amendment from the Government increasing its contract by $275,000.00 to dispose of additional wood debris that had since accumulated at the face of the dam (Exhibit F). Although the ACOE and Union City estimated this new accumulation at 18,000 cubic yards (Exhibit 20 and Transcript, pp. 142-143, 172-173), Union City was able -- according to its records (Exhibit D) to remove only 1,100 yards (Transcript, pp. 222-225). For that, it was ultimately paid an additional $240,000 (Exhibit K), or $218 per yard, compared with Plaintiff's price of $10 per yard. Of course, Union City applied nothing of this windfall to the balance it owed the Plaintiff.

Union City and its sureties forced Plaintiff to hire a lawyer and sue for its balance, and when it did the Defendants filed an Answer on August 11, 2005 (part of docket entry #1) that not only denied the accuracy of Plaintiff's daily tickets, but also alleged that:

> 12. "Plaintiff's contract with defendant was subject to the terms and conditions of defendants' contract with the Army Corps of Engineers and the Rules and Regulations pertaining thereto." [In fact it was not and no such proof was ever offered.]
>
> 15. "The defendant actually counted each truckload of removals, based on truck capacity and load and determined that only 5,392 cubic yards of chips were removed." [This statement was knowingly or recklessly false.]
>
> 17. "The true amount owed by plaintiff to defendant is the sumof $23,170." [This statement was knowingly or recklessly false.]
>
> 19. "Defendant has certified, under oath, to the Army Corps of Engineers, to the removal of $53,920 cubic yards worth of chips." [This statement was knowingly or recklessly false.]
>
> 22. "Defendant has been informed by the Army Corps of Engineers that a 40 year history of debris removal did not

> indicate removals in excess of 5,000 cubic yards of wood chips."
> [Defendant's proof showed this to be a gross exaggeration.]
>
> 23.   "The claim of plaintiff that it removed 114,700 cubic yards of chips is false and fraudulent and was made with the intent of defrauding the defendant and the United States Government." [This grossly overstated Plaintiff's claim and no proof was offered to support the claim of fraud by Plaintiff.]

A year later, on August 29, 2006, and more than a month after Union City had been paid in full by the Government for 6,840 cubic yards of wood chips (Transcript, p. 265), Defendants filed an Amended Answer (docket entries #31 and #35) that repeated the frivolous allegations previously made, and falsely added that:

> 21.   "Defendant has not been paid by the United States Government for chip removals exceeding 4,820 cubic yards".

It also added, as part of a new "Second Affirmative Defense," that Plaintiff's contract required that "all chipped debris was to be hauled from the Mt. Morris Dam site to the Ontario County Landfill;" and that since Plaintiff had failed to so dispose of its chips it had "willfully overcharged and defrauded Union City and the Government," and "did violate the rights of the public to the safe and lawful disposal of solid waste." This affirmative defense was revealed as completely frivolous at trial, as was Defendant's related new "Third Affirmative Defense." Transcript, pp. 29-32, 126, 346-347.

Besides filing frivolous Answers and Counterclaims, Defendants resisted providing document disclosure to the Plaintiff for more than a year, requiring Plaintiff to make two court applications. See docket entry #20.

At the trial the dishonest tactics continued, as specters of defenses were raised but never supported. These included counsel's innuendo -- without any good faith basis as the case developed -- that Plaintiff had cheated the Government by removing only part of a finished

cone of chips thereafter building a new cone on the base of a prior one; also that Plaintiff had failed to remove from the site substantial quantities of the chips it produced. Plaintiff's President resolutely denied both accusations and none of Defendants' witnesses offered any testimony in support of either. Although Union City's employees were in a position to check Plaintiff's work they either chose not to do so or saw nothing wrong with it. Transcript pp. 137, 157-158. And before Plaintiff left the work site representatives of both Union City and ACOE inspected the work and found it to be complete. Transcript, pp.59-60.

Counsel claimed that plaintiff's own records would prove its quantities exaggerated but that claim, too, proved baseless. The "records" to which counsel referred was the project folder (Exhibit 7) on which Plaintiff's president made "daily notes," as he did "for every job," to record "what took place on the project" (Transcript, p. 10). But those notes fully corroborated the work tickets upon which Defendants' "CQC Reports" and Plaintiff's invoice were based.

Ultimately, Defendants' only "defense" was that Plaintiff's recorded quantities were simply improbable in light of historic removals at the Dam. But as discussed above, Defendants' proof not only failed to support the desired inference, but it actually proved the contrary, particularly in light of the large volumes of debris estimated to have been present for Union City's "emergency" project in October 2004.

Throughout this entire period of deception, dissembling and delay, Defendants paid Plaintiff for only 3,000 yards of removals, when Union City was itself paid for almost 7,000 yards by the Government, plus $240,000 more for processing 1,100 yards of chips in the fall of 2004. Because Union City blew its bid -- because it stood to lose five dollars for every additional yard it submitted to the Government (Transcript, pp. 162, 165, 171) -- Union City deliberately and dishonestly reduced the quantities for which Plaintiff was entitled to be paid.

And the Defendant sureties, as well as counsel, played along out of, at best, reckless indifference.

It may be a rare case in which the "bad faith" exception to the "American Rule" will justify an award of attorneys' fees, but certainly this is such a case.

Dated:  February 29, 2008

Yours, etc.

_____
Anthony J. Adams, Jr., Esq.
GATES & ADAMS, P.C.
Attorneys for Plaintiff
28 East Main Street, Suite 600
Rochester, New York  14614
Telephone:  (585) 232-6900