UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

EMPIRE ENTERPRISES JKB, INC.,

              Plaintiff,

        v.

UNION CITY CONTRACTORS, INC.,
NOVA CASUALTY COMPANY, and
NOVA AMERICAN GROUPS, INC.,

              Defendants.

_____

<u>DECISION & ORDER</u>

05-CV-6461P

## **INTRODUCTION**

      This case involves a breach of contract claim by Empire Enterprises JKB, Inc.

("Empire") against Union City Contractors, Inc. ("Union City") and a Miller Act claim, 40

U.S.C. §§ 3131 and 3133, against its sureties, Nova Casualty Company and Nova American

Groups, Inc. (collectively, "Nova").[1]  Pursuant to 28 U.S.C. § 636(c), the parties have consented

to the disposition of this case by a magistrate judge.  (Docket # 7).

---

[1] Empire has failed to comply with the Miller Act's requirement that suits be brought "in the name of the
United States for the use of the person bringing the action."  40 U.S.C. § 3133(b)(3)(A).  Defendants have not
objected to the improper captioning.  The error is, in any event, "at most a formal irregularity, which ought not to
affect the [court's] jurisdiction." *Blanchard v. Terry & Wright, Inc.*, 331 F.2d 467, 469 (6th Cir.), *cert. denied*, 379
U.S. 831 (1964); *accord Hendry Corp. v. American Dredging Co.*, 318 F.2d 299, 301 (5th Cir. 1963).  Because the
"interest of the United States was merely nominal" and the "use plaintiffs were the real parties in the interest,"
*Blanchard v. Terry & Wright, Inc.*, 331 F.2d at 469-70 (citing *Equitable Sur. Co. v. United States ex rel.
W. McMillan & Son*, 234 U.S. 448, 457 (1914)), the captioning error does not affect my determination of the Miller
Act claim.  *See also Safe Env't of America, Inc. v. Employers Ins. of Wausau*, 278 F. Supp. 2d 121, 123 n.1
(D. Mass. 2003) (noting incorrect caption, but proceeding to determine unrelated motions).

**Overview**

In July 2004, the United States Army Corps of Engineers entered into a contract with Union City for the removal and disposal of tree debris and silt from the Mount Morris Dam in Livingston County, New York. Shortly thereafter, in August 2004, Union City entered into a subcontract with Empire, pursuant to which Empire agreed to chip and remove the tree debris, also referred to as "floatable debris," from the dam. The contract required Union City to pay Empire $10 per cubic yard of debris chipped and removed from the site. Empire claims that it performed its contractual obligations by removing 11,470 cubic yards of material, but that Union City paid it only for approximately 3000 cubic yards. Empire seeks payment of the alleged balance, $84,653.63, plus interest. (Docket # 1, Ex. A). As an affirmative defense, defendants have asserted that Empire fraudulently and substantially overstated the quantity of debris that it removed from the dam site. (Docket # 31).[2]

A bench trial was conducted in January 2008. The testimony at trial related principally to Empire's work on the project, and specifically to the dispute over the quantity of debris that it chipped and removed during the course of that work. Defendants argue that the trial evidence demonstrates that Empire's quantity calculations are not credible. Specifically, defendants contend that Empire's representation that it removed 11,470 cubic yards of material is grossly inflated when compared with the historical data for the dam site. Second, defendants

---

[2] Defendants' answer also includes two other affirmative defenses regarding Empire's alleged use of a dumping site twenty-five miles away from the dam site. (Docket # 31 at ¶¶ 25-35). In these affirmative defenses, defendants sought a credit for dumping fees that defendants maintained Empire charged, but did not incur. (Id.). These defenses apparently have been abandoned because this theory was never developed in the trial testimony. Even if they have not, the defenses lack merit. As the trial testimony established, the dumping site that Empire used was within two miles of the site, and not beyond the ten-mile radius that entitled Empire to charge trucking fees. (Trial Transcript ("Tr.") 30, 126). No evidence exists that Empire did charge Union City any trucking fees, and the relevant invoices demonstrate just the opposite. (Trial Exhibits ("Exs.") 10, 11).

maintain that Empire's record-keeping practices were unreliable and that Empire's bills to Union City were fraudulently based upon Empire's inaccurate records.

Empire counters that its calculations were accurate and that Union City accepted its performance when it signed Empire's daily reports reflecting the quantity of debris chipped and removed each day. Empire further argues that Union City has waived its right to challenge the accuracy of Empire's calculations by failing to contest the quantities reported until approximately three months after Empire had completed its work and Union City had issued two payments on the account.

**Union City's Bankruptcy**

After trial and the submission of post-trial memoranda, defendants' counsel advised this Court by letter that Union City had filed for bankruptcy under Chapter 7 of the Bankruptcy Code. The parties concede that, as a result of this filing, the automatic stay under Section 362 of the Code applies to Empire's claims against Union City in this litigation. *See* 11 U.S.C. § 1362. Because the stay has not been lifted, this Court may not determine Union City's liability, if any, on Empire's claim.

The automatic stay does not apply, however, to claims against the bankrupt debtor's sureties. *In re Capitol-York Constr. Corp.*, 43 B.R. 52, 55-56 (S.D.N.Y. 1984) (collecting cases). Thus, Empire's Miller Act claim against Nova under the payment bond may proceed without violating the stay. *Id.* at 56 ("[a] subcontractor's action against a general contractor's surety to recover under a Miller Act bond which was posted to protect materialmen for public works projects does not implicate Code § 362 because the bond is not property of the

debtor's estate").  *See United States ex rel. F&G Mech. Corp. v. Manshul Constr. Corp.*, 1998 WL 849327, *1 n.7 (E.D.N.Y. 1998) (due to post-trial bankruptcy of defendant contractor, court proceeded to determine liability under the Miller Act only of co-defendant surety).

Although some authority suggests that the Court may impose an equitable stay under these circumstances, *see United States ex rel. Cent. Bldg. Supply, Inc. v. William F. Wilke, Inc.*, 685 F. Supp. 936, 938-39 (D. Md. 1988) (affirming equitable stay because bankrupt contractor represented that it had good faith and valid defenses to subcontractor's claim, but surety had no knowledge of such defenses), Nova's counsel has not sought one.  Moreover, I find that no basis in equity exists to impose one here considering that Nova has answered Empire's complaint and has participated through counsel in the entirety of this litigation, including trial. For these reasons, I will proceed to determine Nova's liability, if any, to Empire on its Miller Act claim.

## FINDINGS OF FACT

### I.  The Parties

Empire is a land clearing, demolition and recycling business owned by Joseph Bartucca.  (Tr. 7).  Union City is a commercial construction company owned by Duane Cuyler; its business consists principally of contracts with federal government agencies.  (Tr. 323-24). Nova is an insurance company that executed a payment bond in the amount of $161,100 for the Mount Morris Dam project.  (Ex. 1).

## II.  The Trial Witnesses

At trial, Empire called Joseph Bartucca ("Bartucca"), the owner and president of Empire, as its sole witness.  (Tr. 6-109, 466-73).  Defendants called four witnesses:  Duane Cuyler ("Cuyler"), the owner and president of Union City (Tr. 322-466); Richard Collins ("Collins"), Union City's project manager for the dam project (Tr. 111-239); Gerald DiPaolo ("DiPaolo"), a civil engineer with the United States Army Corps of Engineers ("ACE") who served as the contracting officer's representative during the project (Tr. 240-305); and, Heather Collins, who was employed by Union City and worked at the project site (Tr. 306-19). Deposition testimony of Jennifer Collins Bertrand, another Union City employee who worked at the dam site, was also admitted.  (Tr. 360; Ex. O).

## III.  The August 2004 Mount Morris Dam Debris Removal Project

### A.  Annual Collection and Removal of Silt and Floatable Tree Debris

The Mount Morris Dam is located on the Genesee River in Livingston County, New York, about forty-five miles south of Rochester, New York.  ACE is responsible for operating and maintaining the dam.  Each year ACE contracts with a private construction company to remove wood debris from the dam site and to redistribute silt from the dam's spillways to the river basin upstream.  (Tr. 243).

Natural forces, including weather events and snowmelt, cause debris to accumulate in and around the dam, and the debris must be collected and removed in order to ensure the proper functioning of the dam.  To assist in the process, ACE employs a structure known as a "log boom," which is a cable consisting of large timbers that is connected from end

to end across the Genesee River several hundred yards upstream of the dam.  (Tr. 17, 114, 336; Ex. 17A).  The log boom is designed to collect floatable debris, such as fallen trees, branches and other objects, and prevent the debris from floating downstream to the dam and blocking the water flow.  (Tr. 336-37).  This debris must be removed on a regular basis, generally annually.  To physically accomplish the removal, ACE lowers the water level of the dam so that the accumulated debris collects at the bottom of the river basin and may be accessed.  (Tr. 115).  Once accessed, the material is ground up or "chipped" and then hauled from the dam site.  In addition to the floatable debris, non-floatable debris known as "silt" collects at the face of the dam and must also be removed to ensure that the spillways do not become blocked.  (Tr. 243).

Several factors affect the quantity of debris that accumulates in the dam site, including the level of rainfall and the severity of the storms in a given year.  (Tr. 137, 140, 172).  ACE engineer Gerald DiPaolo testified that approximately 2000 cubic yards of floatable debris had been removed from the dam sites in 2002 and 2003.[3]  (Tr. 244, 345).  Although DiPaolo was familiar with the quantity of material reported to have been removed in 2002 and 2003, he did not actually observe the material in those years and thus could not visually compare the quantity of debris that had collected in 2004, the contract year at issue, to that which had collected in the earlier two years.  (Tr. 247).  In 2004, the volume of floatable debris was substantial enough to breach the log boom and become trapped downstream at the face of the dam.  (Tr. 17, 169; Ex. 13).  Several of the witnesses testified that the breach occurred after Union City's bid was

_____

[3]  A 2003 letter from ACE to the New York State Department of Environmental Conservation, however, stated that at that time ACE expected annual quantities of 5000 cubic yards of wood debris, based upon "what ha[d] occurred in past years."  (Ex. 27).

accepted by ACE in July 2004, but before work on the project began (Tr. 169, 409-13; Exs. 13, 17B), although Bartucca testified that the breach occurred in the Spring of 2004. (Tr. 17).

## B. **The 2004 Contract Between Union City and ACE**

In the Spring of 2004, Union City submitted a bid to ACE to remove floatable debris and non-floatable silt from the dam. (Tr. 251; Exs. 19, 31). The bid specified that Union City would be paid a unit price of $14 per cubic yard for the first 2000 cubic yards of floatable debris and $5 per cubic yard for any additional debris up to 2000 cubic yards.[4] (Tr. 164-65; Exs. 18 at 51-52, 19). Thus, the bid contemplated payment for up to 4000 cubic yards of floatable debris. Union City's owner, Duane Cuyler, testified that the quantities that he included in his bid were based upon historical data that ACE had provided his company. (Tr. 346). ACE formally notified Union City that its bid was accepted in July 2004.[5] (Tr. 409-10; Ex. 31). As a condition of acceptance, ACE required Union City to obtain payment and performance bonds for the contract. (Ex. 31). Nova executed such bonds as surety for Union City. (Docket # 1, Ex. C).

Work on the contract was to begin the Summer of 2004. (Tr. 251; Ex. 19). At that time, Union City had neither the experience nor the equipment necessary to chip and remove the floatable debris. (Tr. 117). Richard Collins, Union City's project manager for the Mount Morris Dam project, knew that Empire had the requisite experience and equipment, so he contacted Joseph Bartucca, Empire's owner, about the project. (*Id.*). Empire was interested in

---

[4] The reason the rate was higher for the initial quantity is because the rate was designed to cover the contractor's project mobilization costs. (Tr. 250, 332).

[5] Pursuant to the contract, Union City was also required to remove or redistribute silt at the dam. (Ex. 19). Empire's subcontract with Union City did not cover silt removal, and Empire was not involved in that work.

the project, and, as Collins testified, Empire was the only experienced contractor available to perform the work in accordance with the contractual schedule.[6] (Tr. 151).

### C. Union City's Subcontract with Empire

Collins contacted Bartucca in the Spring of 2004 to discuss the project. (Tr. 12). Bartucca informed Collins that Empire was interested in the work, but that he would need to visit the dam site. (*Id.*). Bartucca made two site visits before the work began – the first in the Spring and the second in mid-July 2004. (*Id.*; Tr. 123). During the first site visit, Bartucca was accompanied by Collins and an ACE representative. At the time of the visit, the water level of the dam was up, preventing Bartucca from accurately assessing the quantity of the material that had accumulated. (Tr. 12-13, 123). Bartucca recalled that they discussed the fact that more material had collected than in recent years as a result of "high waters that Spring" and that some material had breached the log boom and reached the dam. (Tr. 17).

The second visit occurred in mid-July 2004 and only Collins accompanied Bartucca. (Tr. 18, 76, 123). By the time of this visit, the water had been drained from the dam, enabling Bartucca to observe more easily the debris around the log boom and dam face. (Tr. 18, 88). Bartucca thereafter contacted Collins with a verbal quote for the proposed work. (Tr. 22).

After some negotiation, on August 8, 2004, Empire and Union City entered into a written agreement. (Tr. 22-23; Ex. 4). The agreement obligated Empire to grind tree debris at the dam and thereafter remove it from the dam to an approved offsite location. (Ex. 4). The

---

[6] Cuyler testified that Union City had another contractor "lined up" to perform the work, but that he left the region before the project began. (Tr. 341).

agreement obligated Union City to collect the debris and transport it to a staging area at the dam site so that Empire could grind it into chips.  (Tr. 28-29; Ex. 4).

Pursuant to the terms of the agreement, Union City agreed to pay Empire $10 per cubic yard of "ground material" with a 2500 cubic yard minimum.  (*Id.*).  As to the minimum yardage clause, the agreement represented that the "pile will generate more than the minimum per Joseph Bartucca['s] calculations."  (Tr. 23-24, 33, 35; Ex. 4).  With respect to the manner in which the quantity was to be measured, the contract provided:

> Note:  all yardage to be measured using the volume of a cone - one
> cone of ground material equals 350 yards per factory spec - yardage
> to be logged daily, with payment to be calculated from daily log
> tickets.

(Tr. 24, 29; Ex. 4).  This clause was accompanied by a handwritten notation stating, "Per Army Corps Written Approval," initialed by "D.C." (Duane Cuyler) and dated August 5, 2004.  (Ex. 4).

The last paragraph of the contract stipulated that the work was to begin on August 9, 2004 and that "[p]ayment [is] due 15 days from date of invoice."  (*Id.*).  The contract was signed by Joseph Bartucca, as president of Empire, and Rick Collins, as project manager for Union City.  (*Id.*).

Read together, Union City's contract with ACE and its subcontract with Empire provided that Union City would earn $4 per cubic yard for the first 2000 cubic yards of material removed from the dam.  On any quantity above that amount, however, Union City would lose $5 per cubic yard.  (Tr. 162, 344, 416-17, 419-20).  Of course, the greater the excess quantity, the greater Union City's losses would be.  (Tr. 419-20).

## D.  The Methodology for Measuring Cubic Yardage

Union City's contract with ACE required that the number of cubic yards of floatable debris removed from the dam site be measured by the "truck method."  (Tr. 150-51, 251, 347).  Under the truck method, the quantity of debris removed was determined by first calculating the volume in cubic yards of the relevant truck bed and then multiplying that number by the number of truck loads removed from the site.  (Tr. 249, 348).

Bartucca did not consider the truck method to be a reliable way of calculating quantity because of the difficulty in ensuring that each truck load is filled to capacity.  (Tr. 26, 78-80).  For this reason, Bartucca insisted upon using the "cone method" instead, which measures the volume of the cone produced by a tub grinder, the equipment used to grind tree debris, and then multiplies that quantity by the number of cones of debris produced.  (Tr. 26-27, 126; Exs. 3, 5A).  After securing ACE's approval following its onsite measurement of a typical cone produced by Empire's tub grinder,[7] Union City agreed to use the cone method to calculate the quantity of ground debris removed from the site.  (Tr. 26-28, 52, 124-25, 251-52, 349-50).  The volume of a cone produced by Empire's tub grinder was determined to be 350 cubic yards.  (Ex. 3).

## E.  Empire's Performance under the Subcontract

On August 9, 2004, Empire began work on the project by mobilizing equipment at the dam site.  (Tr. 36; Ex. 7).  The actual chipping and removal began the following day.  (Tr. 45;

---

[7]  Following commencement of work on the project, Bartucca, Collins and an ACE representative met at the job site to verify the measurements of the cone that Bartucca's tub grinder created.  (Tr. 52, 124-25).

Ex. 6A). Empire's work took approximately two weeks to complete (Tr. 44), and August 26, 2009 was the last day that Empire was onsite. (Tr. 56, 59).

Bartucca and his workers were stationed in the river basin during the project – first near the log boom and then near the dam face. (Tr. 40-41, 467). As the contract specified, Union City collected and transported the debris from the log boom and dam face to Bartucca's staging area, where the tub grinder was located. (Tr. 41, 338, 340). Bartucca then would load the debris into the tub grinder and grind it, resulting in a cone of chipped debris. The debris then would be loaded into a truck and eventually removed from the site. (Tr. 38-41).

During the course of the project, Bartucca was at the job site every day. (Exs. 6A-6J, 7). Cuyler was rarely there and recalled being present only once while Bartucca was chipping debris. (Tr. 347, 389-90). Collins, while present at the dam, was rarely in the grinding area to observe Bartucca's work and did not monitor Bartucca's work or verify his cone count. (Tr. 127, 137). The only Union City employee who was physically in a position to observe Bartucca's daily activity was Heather Collins, Rick Collins's then-teenaged daughter, who worked as a safety flagger; she was stationed at the bottom of the access road near Bartucca's staging area. (Tr. 127-29, 306). The only other Union City employee regularly on the job site was Jennifer Bertrand (then Collins), another daughter of Rick Collins, who was stationed in a construction trailer at the top of the access road. (Tr. 129-30; Ex. O at 12-13). She also worked as a safety flagger and performed administrative work, including signing Bartucca's daily tickets. (Tr. 47-49, 55-56, 130, 350; Exs. 6B-6J, O at 10-16, 18-25).

At the end of each day, Bartucca prepared a written receipt, which he referred to as a "ticket," reflecting the total quantity in cubic yards of debris chipped that day. (Tr. 44,

48-49; Exs. 6A-6J). At the end of each day, he would present the ticket for signature by a Union

City representative. (Tr. 49). On the first day that Empire began chipping, August 10, 2004,

Rick Collins signed the ticket. (Ex. 6A). On each successive day, Jennifer Bertrand signed the

tickets. (Tr. 49; Exs. 6B-6J, O at 19-20).

Bartucca testified that at the end of each day, he discussed his cone count with

Heather Collins and Jennifer Bertrand and secured their agreement with the count. (Tr. 48-49,

94-96). Specifically, he stated,

> [I]n the evening, [Heather] would ride back up to the top of the hill
> with us in our service truck, and we would discuss the number of
> cones we produced that day, whether it was one, two, three, four.
> We discussed that on the way up in the truck. And then the three
> of us went into the construction trailer; myself, Heather, and
> Jennifer was in the trailer, and the ticket was – we compared our
> notes and it was agreed upon and the ticket was produced.

(Tr. 48-49). He further testified that Heather counted cones and made notes of her count. (Tr.

94). Heather Collins testified, by contrast, that she did not count the cones and did not discuss

the cone count with Bartucca. (Tr. 314-16). In an earlier deposition, Jennifer Bertrand testified

that she accepted the cone count that Bartucca gave her when she signed the tickets because she

could not see his work from her job location and did not otherwise verify his count. (Ex. O at

15-19, 30).

According to the daily tickets signed by Bartucca and Union City, Empire chipped

and removed 11,470 cubic yards of debris between August 10, 2004, the day Empire began

chipping, and August 25, 2004. (Exs. 6A-6J). That amount is derived by adding the quantities

noted on each daily ticket.

During the period August 10 through August 18, the tickets reflect daily quantities of "cubic yards chipped."  (Exs. 6A-6G).[8]  For example, the August 10, 2004 ticket reflects 1050 "cubic yards chipped."  (Ex. 6A).  As Bartucca testified, that amount represented three cones of material chipped, consistent with the parties' prior agreement reflected in the subcontract that one cone represented 350 cubic yards.  (Tr. 26-28, 45; Ex. 4).

During the period August 19 through August 25, the tickets reflect daily quantities of "cubic yards chips removed."  (Exs. 6H-6J).[9]  Bartucca testified that he began to report the quantities of chips removed, rather quantities chipped, to comply with ACE's mid-project directive to abandon the cone method of determining quantity and begin using the truck method.  (Tr. 50-51).

On August 19, 2004, Collins notified Bartucca to change to the truck method because ACE no longer wanted to use the cone method.  (Tr. 50, 133-35; Ex. 8).  DiPaolo, the ACE representative, testified that the change was occasioned by "a possible discrepancy" observed in the quantity of silt that Union City reported had been removed from the site and the

---

[8]  Specifically, the tickets during this period reflect the following daily quantities:

| DATE | QUANTITY OF "CUBIC YARDS CHIPPED" | EXHIBIT NO. |
| --- | --- | --- |
| 8/10/04 | 1050 | 6A |
| 8/11/04 | 700 | 6B |
| 8/12/04 | 1050 | 6C |
| 8/13/04 | 1400 | 6D |
| 8/16/04 | 1400 | 6E |
| 8/17/04 | 1050 | 6F |
| 8/18/04 | 2100 | 6G |

[9]  Specifically, the tickets during this period reflect the following quantities:

| DATE | QUANTITY OF "CUBIC YARDS CHIPPED" | EXHIBIT NO. |
| --- | --- | --- |
| 8/19/04 | 350 | 6H |
| 8/20/04 | 1008 | 6I |
| 8/25/04 | 1362 | 6J |

quantity reflected in records kept by ACE's contract representative. Empire had no involvement in the silt removal work or the contract to perform such work. (Tr. 253, 257-58; Ex. G). This discrepancy caused ACE's contracting officer to question the reliability of the cone methodology, resulting in "the decision . . . to revert back to the truck method so as to take any measurement error out of it, because the truck method of measurement is more definitive than a cone measurement." (Tr. 258; Ex. L). Bartucca testified that no one from Union City or ACE ever expressed to him any dissatisfaction with the cone methodology or the accuracy of his counts. (Tr. 105, 108). Cuyler testified that he informed Bartucca that ACE required the change because "they just didn't believe our counts." (Tr. 363).

Bartucca complied with ACE's directive to Union City to utilize the truck method. To effect the change, Bartucca and ACE agreed on the cubic yard capacity of each truck bed, and Bartucca began to count the truck loads removed from the site. (Tr. 53-54, 84-85).

The quantities reflected on Bartucca's daily tickets are corroborated by contemporaneous notes that Bartucca made on a folder that he kept at the job site, with the exception of August 17 and 18, 2004, which are not listed on the folder. (Tr. 10-11, 100-101; Ex. 7). The folder contains handwritten notations made by Bartucca of the daily quantities chipped and removed. Other than the dates of August 17 and 18, for which no quantity data is noted, the quantities of debris chipped during the period August 10 through 16 and debris removed during the period August 19 through 25 are identical to those reported on the daily tickets. (*See* Exs. 6A-6J, 7).

The notes on the folder also corroborate Bartucca's testimony that when Empire chipped more material than they removed on a given day, Bartucca was careful to avoid

14

double-counting the material. After the change to the truck method, for example, Empire submitted tickets reflecting only the quantity removed and not the quantity chipped in order to ensure that it did not overbill Union City. (Tr. 101-103, 57-58). Specifically, his folder notes reflect that on August 19, Empire chipped 700 cubic yards, but removed only 350; the August 19 ticket reflects 350 cubic yards removed. (Exs. 6H, 7). Similarly, his folder notes show that on August 20, Empire chipped 1400 cubic yards, but removed 1008; the August 20 ticket reflects 1008 cubic yards removed. (Exs. 6I, 7). In addition, Bartucca's folder notes for August 25 state, "1362 yards removed Billable[;] 654 yards removed under contract." (Ex. 7). Bartucca testified that on August 25, Empire removed a total of 2016 cubic yards, but only billed Union City for 1362 yards because the remaining 654 yards already had been recorded on a prior ticket as "yards chipped." (Tr. 57-58).

With respect to the accuracy of Empire's cone count, defendants suggest that Empire did not completely remove the debris at the bottom of a cone before beginning to build a new cone. (Tr. 372-75). Such a practice would result in inflated yardage because some material would be counted in more than one cone.

This scenario, if theoretically possible, is unsupported by any credible evidence, however. Bartucca testified that each cone was cleared before starting another. (Tr. 108). Collins testified that he did not observe Bartucca make cones and had "no idea" whether Bartucca began each cone on level ground, and Cuyler only observed Bartucca working on one cone and was not familiar with the procedures for making cones. (Tr. 127, 372-75, 391, 398). Indeed, the only Union City witness with some knowledge about Bartucca's cone-making practices was Heather Collins. She testified that she observed Bartucca chip debris into a cone

shape, "remove the material, make a clear working space and continue chipping." (Tr. 310).
Although she explained that "it would be impossible to get every single chip that he had
chipped," she stated that he removed "the majority of the cone" and was able to "make a level
area to continue working." (Tr. 309-10).

## F. Union City's Acceptance of Empire's Performance

As a requirement of its contract with ACE, Union City submitted daily reports of
the work completed at the site, known as contractor quality control reports or "CQC reports."
(Tr. 130-32, 149; Ex. B). Jennifer Bertrand completed the CQC reports. (Ex. O at 14-16). On
each report, Bertrand noted the cubic yards of debris chipped and/or removed, and those
quantities were derived exclusively from Bartucca's daily tickets. (Tr. 133; Ex. O at 14-16).
Thus, all the daily quantities listed on the CQC reports are identical to those reported in
Bartucca's tickets, with the exception of the CQC report for August 19, 2004, which simply
notes that five "dump trailer loads" of chips were removed. (*See* Exs. 6A-6J, B).[10] All of the
CQC reports were signed by an authorized Union City manager, who certified to the accuracy
and completeness of the report. (Tr. 155, 159-61; Ex. B).

As the project was progressing, Union City recognized that the quantity of
floatable debris would exceed the 4000 cubic yards for which it had contracted. (Tr. 162-63,
168, 405-20; Ex. 13). On August 12, 2004, Collins assisted Cuyler in drafting a letter to ACE
explaining that as of that date, 2800 cubic yards of material had been chipped and estimating that

---

[10]  The August 20, 2004 CQC report contains the handwritten notation, "to date wood chip removal = 5458
cubic yards." (Ex. B). No credible testimony was offered to explain the notation or its obvious discrepancy with the
daily quantities reported on the daily CQC reports and Bartucca's daily tickets. (Tr. 227-29). Indeed, despite
certifying the CQC report on which that total was noted, Collins testified that he could not even guess how that
number had been derived. (Tr. 230).

the final quantity could reach 8000 to 9000 cubic yards.  (Ex. 13).  The letter attributed the excess quantity to "a tremendous volume of floatables" released as a result of a log boom breach and heavy rainfall that had occurred after Union City had submitted its bid.  (Tr. 169; Ex. 13).  Union City noted that it was "aligned to lose several thousand dollars" and requested ACE's "help in finding a solution to [the] problem."  (Tr. 171; Ex. 13).

On August 23, 2004, Cuyler faxed a letter to DiPaolo seeking an "equitable adjustment" to the contract.  (Tr. 191-96, 424-25; Ex. 23).  Specifically, Union City requested that ACE increase the quantity of floatable debris authorized under the contract and increase the contract rate to $16 per cubic yard.  (*Id.*).  That same day, DiPaolo provided Cuyler a modified contract approving an increase from 2000 to 7300 cubic yards in the authorized quantity of floatable debris over 2000 cubic yards.  (Tr. 196-98; Exs. 23-A, 24).  No increase in the contract rate of payment was approved, however.  (Tr. 425-26; Ex. 34).  As a result of the change, Union City was permitted to bill ACE up to 7300 cubic yards of floatable debris at the rate of $5 per cubic yard, in addition to the initial 2000 cubic yards at the higher rate of $14 per cubic yard. (*Id.*; Tr. 423).  In other words, although Union City was authorized to bill ACE for a total of 9300 cubic yards of floatable debris, Union City would still lose $5 per cubic yard for every yard over the original 2000 because it was obligated to pay Empire $10 per cubic yard.

At the end of the project, on August 26, 2004, Bartucca, Collins and a representative from ACE inspected the site, and Collins and the ACE representative agreed that Empire had completed its contract.  (Tr. 59-60, 157-58).  Neither Collins nor the ACE representative indicated that Empire had not fully completed its work or expressed dissatisfaction

with Empire's performance.[11]  (Tr. 60, 157-58; Ex. 18 at 74).  Indeed, photographs taken after the work was completed reveal a clean work site, free of debris.  (Tr. 42-43, 59; Exs. 5G, 5H).

That same morning, after adding Bartucca's daily tickets, Collins informed Bartucca for the first time that ACE had authorized Union City to remove only 9300 cubic yards of chips.  (Tr. 469).  Collins told Bartucca that he had not realized until then that Empire had chipped and removed more than 9300, and he asked Bartucca to revise his daily tickets to adjust the quantity to 9300 cubic yards.  Bartucca refused to do so.  (*Id.*).

### G.  Union City's Payments to Empire

On September 22, 2004, Empire submitted an invoice to Union City for chipping and removing 11,470 cubic yardage of debris.  (Tr. 62-63; Ex. 10).  At the contract rate of $10 per cubic yard, the invoiced amount was $114,700.  (*Id.*).  On September 30, 2004, Union City paid Empire $10,750, which included payment of $703.63 for the rental of a piece of equipment, which had been separately invoiced.  (Tr. 63-65; Ex. 11).  On October 13, 2004, Union City issued a second payment to Empire, this time in the amount of $20,000.  (Tr. 65; Ex. 11).  That was the last payment Empire received from Union City.  (Tr. 67).

On October 13, 2004, Empire sent another invoice to Union City for the balance due of $84,653.63, but did not receive a response.  (Tr. 64-65; Ex. 11).  On October 26, 2004, Empire faxed the October 13th invoice to Union City again, noting that payment was overdue.  (*Id.*).  Empire's contemporaneous records reflect that a meeting was scheduled with Union City on November 16, 2004, but did not take place.  (Ex. 12).

---

[11]  The ACE representative observed two small logs on the bank of the roadway, which Empire thereafter removed.  (Tr. 60).

Bartucca testified that he telephoned Cuyler several times regarding payment, and each time Cuyler assured him that payment was forthcoming. (Tr. 67-70; Ex. 18 at 82). According to Bartucca, Cuyler never disputed the amount of Bartucca's bills or the quantity of debris that he reported having chipped and removed. (Tr. 68, 469). Cuyler's testimony on this issue was inconsistent: in his deposition, he admitted that he had never disputed Bartucca's bills with him (Tr. 446-49), although he testified at trial that he had a conversation with Bartucca in October or November 2004 in which he told Bartucca that Union City's records revealed a smaller truckload count than Bartucca's. (Tr. 378-80). The last call between Bartucca and Cuyler occurred shortly before Thanksgiving 2004. (Tr. 70, 470). Follow-up telephone calls from Empire to Union City on November 29, 30, and December 1, 2 and 6, 2004 were not returned. (Tr. 69-70; Ex. 12).

On November 30, 2004, shortly after Bartucca's last call with Cuyler, Bartucca received a letter from Union City's attorney representing that Union City had "logged each truck leaving the site by size of truck and date"[12] and suggesting that Bartucca may have submitted false invoices to a government agency by "submitt[ing] both cone and truck measurements for the same cubic yardage removed." (Tr. 70-72; Ex. 15). On December 8, 2004, Union City's attorney sent a second letter regarding payment. (Tr. 72-74; Ex. 16). This letter enclosed a release for Empire to sign in return for a payment of $53,920, a settlement figure to which the letter represented Empire had previously agreed. (*Id.*). At trial, Bartucca testified and Cuyler conceded that Bartucca had never agreed to such a settlement. (Tr. 73-74, 448-49). No further

---

[12]  This trial testimony disproved this claim. (Tr. 312-13, 319).

communications concerning payment occurred between the parties prior to the filing of this lawsuit. (Tr. 73, 470).

Cuyler testified that he felt that he was in a "tug of war" between Empire and ACE. (Tr. 384, 445). Cuyler stated that he tried to "fight" with ACE for Empire's "number" of 11,470, but ACE discredited that yardage as inaccurate. (Tr. 352, 363, 434-37). Cuyler admitted he never submitted to ACE a written request for payment for 11,470 cubic yards. (Tr. 438).

## H. Payments by ACE to Union City

ACE paid Union City a total of $52,100 for chipping and removing 6820 cubic yards of floatable debris. (Tr. 262, 265, 275, 298, 433; Ex. 29). The payment was made in two installments: the first, in the amount of $38,000 representing payments for 4000 cubic yards (the first 2000 cubic yards at the contract rate of $14 per cubic yard and the next 2000 at the contract rate of $5 per cubic yard) was made on August 27, 2004 (Tr. 265, 276, 289-90); the second, in the amount of $14,100 representing payment for an additional 2820 cubic yards (at the contract rate of $5 per cubic yard) was made two years later on July 11, 2006 (Tr. 265, 276-77, 293-94). ACE determined that 6820 was the correct yardage based upon Union City's August 20, 2004 CQC report, stating that 5458 cubic yards had been removed to date, and adding to that figure the 1362 cubic yards that Union City's CQC reports reflected were removed thereafter. (Tr. 275, 281-82; Exs. B, G, J). As discussed *supra*, defendants could not explain how Union City had arrived at the 5458 number, which is inconsistent with Bartucca's tickets, as well as the daily quantities reported on the CQC reports.[13] (Tr. 227-30).

---

[13] In its post-trial submission, defendants included a chart attempting to show how Union City may have derived the figure of 5458 cubic yards, but its premises are far too speculative to credit. (Docket # 39).

Following the completion of the project, Union City submitted an invoice to ACE reflecting that Union City had paid $40,000 to Empire for removal of floatable debris, when in fact it had paid only $30,000. (Tr. 300-301, 433, 453-54; Exs. 11, 30). Cuyler testified that Empire was listed incorrectly on the invoice, which pertained to the October 2004 work discussed *infra*, and that Union City should have been identified instead of Empire as the "subcontractor." (Tr. 457).

Cuyler affirmed at trial that he knew that Empire had removed more yards than that for which it had been paid. (Tr. 448-50).


## IV.  Union City's Fall 2004 Contract with ACE

Union City elicited testimony at trial about a subsequent contract modification that it entered into with ACE to clean up the dam site following a hurricane in October 2004, which caused substantial quantities of debris to breach the log boom and amass in and around the dam. (Tr. 137-38, 363-64, 367). Empire was not a party to that contract modification, nor was it involved in any way with the work covered under that modification.

The testimony about this later project was apparently offered to show that because Union City removed only approximately 1100 cubic yards of debris after the hurricane (Tr. 220; Ex. D), Empire's representations that it had removed over ten times that amount weeks earlier must be grossly inflated. (Tr. 147). The principal deficiency in Union City's contention is that the testimony revealed that the hurricane project was terminated early before all the debris had been removed. (Tr. 225, 304, 370). Cuyler testified that while the project was ongoing, water from an upstream dam was mistakenly released into the dam, causing flooding, the dispersal of

debris that had been chipped but not yet removed, and the submergence of Union City's equipment. (Tr. 369-70). This event, coupled with the fact that Union City's project costs were approaching the lump sum contract bid price of $275,000,[14] caused ACE to shut down the project. (Tr. 225, 266, 295, 304, 370; Ex. F). Significantly, although only approximately 1100 cubic yards were removed by the project's termination, the parties had estimated that the site contained approximately 18,000 cubic yards of floatable debris at the project's inception. (Tr. 142-43, 172-73; Ex. 20). According to Collins, when the project was terminated, "a lot of debris" was left behind. (Tr. 225).

This testimony also highlighted the significance of weather in determining the quantity of debris that accumulates at the dam. For this reason, quantity projections based upon historical data – particularly where, as here, the data is limited to only several years – may prove unreliable.

## CONCLUSIONS OF LAW

## I. Empire's Breach of Contract Claim Against Union City

As discussed *supra*, Union City filed for bankruptcy protection after the trial in this case was completed. The automatic stay provided for in the Bankruptcy Code thus bars this Court from determining whether Union City is liable to Empire on its first cause of action,

---

[14] Indeed, based upon Union City's costs during the hurricane project, ACE paid it $240,000 for that work. (Tr. 296-97; Ex. K).

asserted against only Union City. Because the stay does not apply to Empire's action against Nova, I turn to that claim.

## II. **Empire's Miller Act Claim Against Nova**

In its second cause of action, Empire seeks to recover from Nova, as surety on Union City's payment bond, the sum of $84,653.63, the balance due on its unpaid invoices to Union City. It also seeks prejudgment interest of 9% and reimbursement of its attorneys' fees on the grounds that defendants' "excuses" for refusing to pay Empire "were frivolous and were advanced in bad faith for purposes of avoiding paying [Empire] even the balance [it] was admittedly owed, and for which Union City was itself paid by the [g]overnment." (Docket # 40 at 3).

Nova has not raised any defense to payment independent of the defenses raised by all defendants that Empire fraudulently misrepresented the quantity of debris that it removed. (*See* Docket ## 31, 39). *See United States ex rel. F&G Mech. Corp. v. Manshul Constr. Corp.*, 1998 WL 849327 at 1 n.1 ("[a]s surety for [contractor], [surety] assumes and is entitled to the defenses available to [contractor]"). By virtue of that misrepresentation, defendants maintain, they should be relieved of any obligation to make further payment to Empire or, at the very least, should be required to pay only for the quantity actually removed, which they maintain is between 5170 and 6820 cubic yards. (*Id.*).

Under the Miller Act, a contractor awarded a contract for the "construction, alteration or repair" of any federal public works project must furnish to the United States a performance bond and a payment bond. 40 U.S.C. § 3131(b); *J. W. Bateson Co. v. United States*

23

*ex rel. Bd. of Trustees of Nat'l Automatic Sprinkler Indus. Pension Fund*, 434 U.S. 586, 587 (1978) ("[u]nder the Miller Act, . . . a prime contractor on a federal construction project involving over $2,000 must post a payment bond to protect those who have a direct contractual relationship with either the prime contractor or a subcontractor") (internal quotation omitted). The payment bond is "for the protection of all persons supplying labor and material in carrying out the work provided for in the contract" and must be executed by an approved surety. 40 U.S.C. § 3131(b)(2). To promote that protection, the Act authorizes any laborer or supplier of materials who has not been paid in full within ninety days of the completion of the work to initiate a civil action on the payment bond for the "amount due." 40 U.S.C. § 3133(b)(1).

The purpose of the Miller Act is "to provide an alternative remedy to the mechanics' liens ordinarily available on private construction projects." *J. W. Bateson Co. v. United States ex rel. Bd. of Trustees of Nat'l Automatic Sprinkler Indus. Pension Fund*, 434 U.S. at 589 (citing *F. D. Rich Co. v. United States ex rel. Indus. Lumber Co.*, 417 U.S. 116, 122 (1974)). Because government property may not be encumbered by liens, Congress determined that persons supplying labor or materials should be protected by a payment bond. *Id.* "The essence of [the Act's] policy is to provide a surety who, by force of the Act, must make good the obligations of a defaulting contractor to his suppliers of labor and material." *United States ex rel. Sherman v. Carter*, 353 U.S. 210, 216-17 (1957). To effectuate these remedial purposes, the Miller Act should be construed liberally. *J. W. Bateson Co.*, 434 U.S. at 594. *See also F. D. Rich Co. v. United States ex rel. Indus. Lumber Co.*, 417 U.S. at 124 ([t]he Miller Act is 'highly remedial [and] entitled to a liberal construction and application in order properly to effectuate the Congressional intent to protect those whose labor and materials go into public projects'")

24

(quoting *Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tomkins Co.*, 322 U.S. 102, 107 (1944)).

The elements of a Miller Act claim on a payment bond are simple and straightforward:  the subcontractor must prove that (1) it provided labor or materials in performing work provided for in a contract for which a payment bond is furnished and (2) it has not been paid in full for the work performed.  *See generally United States ex rel. Susi Contracting Co. v. Zara Contracting Co.*, 146 F.2d 606, 612 (2d Cir. 1944).  *See also United States ex rel. Warren Painting Co. v. J. C. Boespflug Constr. Co.*, 325 F.2d 54, 62 (9th Cir. 1963) ("[a]ll that is required [to establish a Miller Act claim] is proof that the labor or material was furnished in the prosecution of the work provided for the prime contract, and that the subcontractor has not been paid therefor").  Stated differently, the plaintiff must show that it complied with its contractual obligations under the subcontract, that it furnished labor in connection with the government project and that full payment has not been made for that work. *United States ex rel. Mandel Bros. Contracting Corp. v. P. J. Carlin Constr. Co.*, 254 F. Supp. 637, 638 (E.D.N.Y. 1966).

Here, Empire subcontracted with Union City to perform work covered by Union City's contract with ACE to remove tree debris from the Mount Morris dam.  Nova does not dispute the validity of either Union City's contract with ACE or its subcontract with Empire. Indeed, the trial proof plainly establishes that Empire and Union City entered into a valid and enforceable contract, the terms of which provided that Empire was required to chip and remove a minimum of 2500 cubic yards of tree debris from the Mount Morris Dam; the agreement set no maximum yardage.  In return, Union City was obligated to pay Empire $10 per cubic yard of

debris removed.  The contract further provided that the quantity of cubic yardage was to be measured by "the volume of a cone" and that the yardage was to be "logged daily, with payment to be calculated from daily log tickets."  (Ex. 4).

The trial proof is equally convincing that Empire satisfied its contractual obligations by chipping and removing debris from the dam during the period August 10 through August 25, 2004.  Bartucca testified that his company was onsite and engaged in this work on each working day (other than August 23rd and 24th) during this period; every other witness who was onsite during the project testified that Empire worked on the project by grinding floatable debris with the tub grinder and then trucking it from the site.  The contemporaneous business records corroborate Empire's work, as do photographs which depict a clean dam site, free of debris, at the conclusion of the project.  Moreover, Bartucca, Collins and DiPaolo conducted a final site inspection at the project's conclusion and concurred that Empire had fully completed its work.  These undisputed and amply-demonstrated facts prove that Empire fits the statutory definition of a person who furnished labor "in carrying out work provided for in a contract for which a payment bond [has been] furnished."  40 U.S.C. § 3133(b)(1).

The issue in dispute is the final element – whether Empire has been fully paid for its labor.  Empire contends that it chipped and removed 11,470 cubic yards, entitling it to payment in the amount of $114,700, but was only paid approximately $30,000 for 3000 cubic yards of material.[15]  Nova disputes that Empire removed 11,470 cubic yards, maintaining instead that it removed between 5170 and 6820 cubic yards.  (Docket # 39).  Regardless of whether

---

[15]  To be precise, Union City paid Empire $30,046.37 for the debris.  That figure is derived by subtracting $703.63, the amount of the equipment rental that was separately invoiced, from the $30,750 that Union City paid Empire in total for its work.

Empire hauled 11,470, 6820 or 5170 cubic yards, the trial evidence nonetheless establishes that Union City did not pay it for any more than 3000 cubic yards. Thus, unless some basis exists to excuse its failure to pay, Nova owes Empire at least $21,700 for the 2170 cubic yards of material – the minimum quantity for which even Union City admits Empire was not paid.

Nova seeks to excuse its failure to pay Empire any additional sums under the bond on the grounds that Empire engaged in fraud by knowingly inflating and misrepresenting the cubic yardage reflected on its daily tickets and fraudulently billing for that inflated and inaccurate yardage. For the reasons discussed below, I reject Nova's excuse for non-payment.

I find that the proof at trial lacks any convincing evidence that Empire inflated the quantities reflected on its contemporaneous daily tickets. Bartucca credibly explained how the quantities reflected on those tickets were derived: he kept track of the number of cones (August 10-18) and truckloads (August 19-25) by recording that information on a daily basis on a folder that he used to document material information about the project. Using that folder, Bartucca then recorded the relevant quantity on tickets that he prepared each day, which Bartucca discussed with and presented to Jennifer Bertrand for her signature. Indeed, Union City recorded those same quantities on the daily CQC reports that it was required to submit to ACE under the term of its contract with ACE.

Nova challenges Empire's representation that it chipped and removed 11,470 cubic yards principally on two bases: first, that the amount differs so substantially from the quantities of debris removed in earlier years that it must be inaccurate and inflated (Docket # 39 at 3-4); and, second, that Empire's tickets reflect double-counting of some material. (*Id.* at 4-6). Both of these argument are refuted by the record.

According to Nova, Empire's quantity is "suspect" because it is in "conflict with the historical cubic yardage of floatable debris removed from the site during a normal year." (*Id.* at 3). The only specific historical data about which any witness testified was the data from the preceding two years, 2002 and 2003. DiPaolo testified that approximately 2000 cubic yards of floatable debris were removed in each of these years. (Tr. 248). This testimony appears to conflict with a 2003 recertification application from ACE to the New York State Department of Environmental Conservation for ACE's "debris removal operations at Mount Morris Dam." That letter application states that, based upon the "scope of what has occurred in past years," ACE expected "[a]bout 5,000 cubic yards of suitable wood material would be chipped" and removed annually. (Docket # 27). Judged by this data, the amount of debris that Bartucca represented he removed in 2004 was approximately twice the average amount.

Moreover, the trial proof underscores the substantial variability in these measurements as a result of such unpredictable factors as snowfall amounts and weather events. For example, as the evidence established, even though the dam had been cleared of accumulated debris by the end of August 2004, a mere few weeks later approximately 18,000 cubic yards of new debris had been deposited.

Defendants argue that Union City's experience with the hurricane project refutes Empire's quantity representations. Specifically, they assert in their post-trial memorandum that the "amount chipped" for the hurricane project was approximately 2500 cubic yards,[16] thus demonstrating that Empire's chip count is "grossly exaggerated." (Docket # 39 at 4). The fatal

---

[16] Although Cuyler testified that he thought that Union City had chipped 2500 cubic yards, the written reports reflect that only 1100 cubic yards were removed. (Tr. 385; Ex. D).

flaw in this contention is that the project was terminated early before the work could be completed, undermining any value in such a comparison.

Nova also assails Empire's quantity representation on the grounds that Empire's own tickets are unreliable because they reflect double-counting of some of the material. This contention is unsupported, and indeed belied, by the trial evidence.

Although Empire's daily tickets include some tickets reflecting "cubic yards chipped" (August 10-18) and others reflecting "cubic yards chips removed" (August 19-25), Bartucca explained that this change was necessitated by ACE's insistence that Empire change its methodology for determining quantity from the "cone method" to the "truck method." To mirror that change, Bartucca ceased recording the quantities of debris chipped (number of cones multiplied by 350 yards) and began recording the quantities of debris removed (number of truckloads of debris multiplied by volume of trailer bed). Precisely to avoid double-counting, Bartucca noted on his folder those instances in which more debris was chipped than removed on a given day (e.g., 8/19 – "700 yds chipped [and] remove 350 chips"; 8/20 – "1400 chipped [and] remove 1008 chips") and recorded on the daily tickets only the amounts removed. Those were the quantities from which his invoices were prepared.[17]

Finally, any suggestion that Union City representatives kept reliable counts of Empire's truckloads that conflict with Empire is equally dubious. First, although Heather Collins testified that she kept logs of Empire's trucks, she explained that she did so out of boredom,

---

[17] Similarly, Bartucca explained that although Empire hauled 2016 cubic yards from the site on August 25th, 654 cubic yards of that total had been reflected as quantities "chipped" on prior tickets. To avoid double-counting, Bartucca's daily ticket for August 25 records only 1362 cubic yards.

rather than obligation, and did not do so on a consistent basis.  Second, even if such logs existed at one time, none was admitted at trial.

In sum, I find that the credible trial proof demonstrates the following.  Bartucca, who was present at the dam site every day that Empire worked on the project, consistently and contemporaneously recorded the daily cubic yardage of debris chipped and removed from the site.  Union City did not, although nothing prevented its representatives from keeping similar tallies.[18]  At the end of each day, a Union City representative signed Bartucca's daily ticket, and that amount was thereafter included in Union City's certified daily reports to ACE.  The aggregate quantity of debris chipped and removed by Empire according to the daily records was 11,470 cubic yards.

This quantity, while greater than the quantities removed from the dam during the preceding two years, was less than the amount that Union City itself estimated had accumulated a mere several weeks after the August 2004 project.  Moreover, the October hurricane apparently caused a breach of the log boom.  Notably, several witnesses testified that at some point after Union City's bid for the earlier August work, a log boom breach had also occurred.  While a log boom breach does not itself cause substantial debris deposits, it may be evidence that a weather event was such a cause.  Had a weather event occurred between Union City's bid and the

_____

[18]  To establish the affirmative defense of fraud in the performance of a contract, a defendant must prove not only that the plaintiff knowingly misrepresented a material fact, but also that the defendant justifiably relied upon the misrepresentation to its detriment.  *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1541 (2d Cir.), *cert. denied*, 522 U.S. 864 (1997).  Where, as here, the defendant contractor had an adequate opportunity to verify the subject of the alleged misrepresentation, justifiable reliable cannot be shown.  *See, e.g.*, *Breco Envtl. Contractors, Inc. v. Town of Smithtown*, 762 N.Y.S.2d 822, 823 (N.Y. App. Div. 2003) (denying leave to amend answer to assert affirmative defense that plaintiff fraudulently misrepresented the number of loads of landfill delivered under contract with town defendant because town "could have devised a method of monitoring the quantities of fill actually delivered[;] [i]ts failure to do so deprives it of justifiable reliance").

commencement of its work in August, that could explain the greater than average quantity of debris that Empire encountered.

On this record, I find that Nova has failed to prove that Empire knowingly misrepresented the quantity of debris that it removed from the dam. Rather, I find that the credible trial proof establishes that Empire chipped and removed 11,470 cubic yards. Because Union City paid Empire for only approximately 3000 cubic yards, Nova is liable under its payment bond for the "amount due" for the remaining 8470 cubic yards. *See Taylor Constr. Inc. v. ABT Serv. Corp.*, 163 F.3d 1119, 1120 (9th Cir. 1998) ("the Miller Act clearly requires a surety to pay the entire amount due under the contract when the prime contractor defaults"). *See also United States ex rel. Taylor & Polk Constr., Inc. v. Mill Valley Constr., Inc.*, 29 F.3d 154, 160-61 (4th Cir. 1994) (Miller Act surety liable to subcontractor under payment bond where subcontractor provided labor for which contractor did not pay and where subcontractor did not breach its agreement with contract); *Lew F. Stilwell, Inc. v. United States ex rel. Air Handler, Inc.*, 358 F.2d 295, 296-97 (9th Cir. 1966) (same); *United States ex rel. F&G Mech. Corp.*, 1998 WL 849327 at 28 (same); *Hi-Way Elec. Co. v. Pathman Constr. Co.*, 404 F. Supp. 398, 404-405 (E.D. Mich. 1971) (same).

## III.  Damages

### A.  Amount Due under Payment Bond

Having found that Empire chipped and removed 11,470 cubic yards of debris, but was paid for only approximately 3000, the remaining question is the "amount due" it under the Miller Act. *See* 40 U.S.C. § 3133(b)(1). Throughout the litigation, Empire has consistently

maintained that it should be paid the amount it is due under the contract of $84,653.63 – the amount of its unpaid invoices to Union City. (Docket ## 1, Ex. A; 40). Nova has not contested this method of calculating damages under the Miller Act.

Moreover, settled authority supports an award of damages on this basis. *See, e.g.*, *United States ex rel. Lincoln Elec. Prods. Co. v. Greeene Elec. Serv.*, 379 F.2d 207, 210 (2d Cir. 1966) (in action brought under earlier version of Miller Act, court held that amount "justly due" under the statute "is determined by the contract price and not the reasonable value of the material" unless there is a "showing of fraud or collusion") (collecting cases); *Taylor Constr. Inc. v. ABT Serv. Corp.*, 163 F.3d at 1122-23 ("there is no doubt that under the Miller Act recovery for work performed under the subcontract is the amount due under the subcontract") (citing *United States ex rel. Lincoln Elec. Prods. Co. v. Greene Elec. Serv.*, 379 F.2d at 210, and *Geis Constr. Co. v. United States ex rel. Tom Igel Co.*, 243 F.2d 568, 569 (6th Cir. 1957)); *United States ex rel. Woodington Elec. Co. v. United Pac. Ins. Co.*, 545 F.2d 1381, 1383 (4th Cir. 1976) (amount "justly due" must be "determined by reference to the subcontract"; "[a] surety is liable for the subcontract price, unless it was fixed by collusion, fraud, or overreaching[, and] [c]onsequently, the surety is obligated to pay the compensation to which the parties have agreed, although this amount [may] exceed[] the cost of labor, materials, and overhead") (internal citation omitted). Accordingly, I determine that Nova is liable to Empire under the payment bond in the amount of $84,653.63.

### B. **Prejudgment Interest**

Empire seeks prejudgment interest in the amount of 9%. Nova has not specifically addressed that request in its post-trial memorandum.

The question of an award of prejudgment interest on a Miller Act claim against a surety "is a matter of federal law." *United States ex rel. Maris Equip. Co. v. Morganti, Inc.*, 175 F. Supp. 2d 458, 460 (E.D.N.Y. 2001) ("any award of prejudgment interest against the sureties is a matter of federal law"), *aff'd*, 67 F. App'x 68 (2d Cir. 2003), and is committed to the sound discretion of the court. *United States v. Seaboard Sur. Co.*, 817 F.2d 956, 965-66 (2d Cir.), *cert. denied*, 484 U.S. 855 (1987). Because the Miller Act does not address prejudgment interest, however, courts routinely resort to state law in determining prejudgment interest, *United States ex rel. Maris Equip. Co. v. Morganti, Inc.*, 175 F. Supp. 2d at 460; *United States ex rel. F&G Mech. Corp.*, 1998 WL 849327 at *27; *United States ex rel. Strober N.J. Bldg. Supply Ctrs., Inc. v. Aetna Cas. & Sur. Co.*, 1995 WL 450977, *1 (E.D.N.Y. 1995), and consistently award prejudgment interest to prevailing parties in Miller Act cases. *See*, *e.g.*, *United States ex rel. F&G Mech. Corp.*, 1998 WL 849327 at *27; *United States ex rel. Strober N.J. Bldg. Supply Ctrs., Inc. v. Aetna Cas. & Sur. Co.*, 1995 WL 450977 at *1.

I find that an award of prejudgment interest at the New York rate of 9% per annum is warranted to compensate Empire for its damages. *See* N.Y. C.P.L.R. § 5004. *See United States ex rel. Maris Equip. Co.*, 175 F. Supp. 2d at 460 (awarding prejudgment interest at New York rate in Miller Act case); *United States ex rel. F&G Mech. Corp.*, 1998 WL 849327 at *27 (same); *United States ex rel. Strober N.J. Bldg. Supply Ctrs., Inc.*, 1995 WL 450977 at *1 (applying prejudgment interest at New Jersey 9% rate). "The appropriate date from which to calculate prejudgment interest owed is 30 days from the date notice is given by the subcontractor of a claim under the bond." *United States ex rel. F&G Mech. Corp.*, 1998 WL 849327 at *27. *Accord United States ex rel. Balf Co. v. Casle Corp.*, 895 F. Supp. 420, 429-30 (D. Conn. 1995)

(quoting *United States v. Quinn*, 122 F. 65, 66 (2d Cir. 1903) (*per curiam*) ("in general, interest, as against the surety, begins to run on the penalty, only from the time of demand upon the surety, or notice to him to pay, or by suit, or by something equivalent to demand or notice")). Here, because notice was given to Nova on January 24, 2005 (Docket # 1, Ex. 1 at ¶ 27), the computation of prejudgment interest shall begin on February 23, 2005.

## C.  Attorney's Fees

Finally, Empire asks this Court to include in its judgment an award of attorney's fees. Such an award is not specifically provided for in Empire's subcontract with Union City.

The Supreme Court has explicitly held that the "American Rule" of attorney's fees applies in Miller Act litigation. *F. D. Rich Co.*, 417 U.S. at 131 (declining "to judicially obviate the American Rule in the context of everyday commercial litigation [such as Miller Act suits]"). Under the American Rule, awards of attorney's fees to prevailing parties "are not ordinarily recoverable in the absence of a statute or enforceable contract protecting therefor." *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 386 U.S. 714, 717 (1967). Empire nonetheless seeks an award of attorney's fees under the judicially-created exception that permits such an award when the unsuccessful party "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *See F. D. Rich Co.*, 417 U.S. at 129.

Having supervised discovery in this matter and presided over the trial, I find that an award on this basis is not justified. On the record before me, I cannot conclude that defendants' position that Empire's quantity representations must have been overstated was advanced in bad faith, vexatiously or for oppressive purposes. Nor do I find that defendants' conduct in litigating this action constitutes any independent basis on which to grant such an

34

award.  *See United States ex rel. Strober N.J. Bldg. Supply Ctrs., Inc.*, 1995 WL 450977 at *28 (denying attorney's fees to prevailing plaintiff on Miller Act claim; based upon court's familiarity with discovery and trial proceedings, court found that defendant's actions were not taken in bad faith, nor were its positions "disingenuous").


## CONCLUSION

For the reasons stated above, judgment shall be entered in favor of the plaintiff Empire Enterprises JKB, Inc. against defendants Nova Casualty Company and Nova American Groups, Inc., jointly and severally, in the amount of $84,653.63, plus prejudgment interest to be calculated at 9% per annum beginning on February 23, 2005.

**IT IS SO ORDERED.**

*s/Marian W. Payson*
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      September   25  , 2009